THE EVANGELICAL ALLIANCE MISSION, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE, Defendant-Appellant.

Second District   No. 2—87—0215

Opinion filed December 31, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart

and Shawn W. Denney, Solicitors General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellant.

Craig O. Larson, of Itasca, for appellee.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

Defendant, the Illinois Department of Revenue (the Department), appeals from two orders entered by the circuit court of Du Page County on February 11, 1987. One order consolidated two administrative cases brought by plaintiff, the Evangelical Alliance Mission (TEAM), seeking a property tax exemption for 1982 and 1983 and granted TEAM leave to file an amended and supplemental complaint. The other order reversed the Department's administrative decisions holding that certain real estate owned by TEAM was subject to taxation and so would remain on the tax rolls for the calendar years 1982 and 1983.

The Department raises two issues on appeal. First, the Department contends that the circuit court did not have jurisdiction over the administrative decision in the 1983 case because TEAM did not file a complaint and have summons issued within 35 days from the date that a copy of the decision in that case was served upon TEAM. (See Ill. Rev. Stat. 1983, ch. 110, par. 3—103.) Second, the Department contends that the trial court erred in holding that the real estate at issue was tax exempt and in reversing the Department's administrative decisions to the contrary. We reverse the order consolidating the 1982 and 1983 cases and granting TEAM leave to file its amended and supplemental complaint. We, therefore, also vacate that portion of the other order relating to the administrative decision in the 1983 case. We affirm the portion of the order relating to the administrative decision in the 1982 case.

TEAM is a not-for-profit corporation which was founded in 1890 and was first incorporated in Illinois in 1897 as the Scandinavian Alliance Mission of North America (its name until 1949). TEAM's articles of incorporation provide:

"Its objective shall be religious, philanthropic, and educational, designed to form a missionary agency representing churches, societies, and individuals for spreading the Gospel of our Lord and Saviour Jesus Christ and establishing, developing, and promoting all phases of church work and missionary activity in foreign lands.

The organization shall never develop into or become an ec-

clesiastical organization or denomination for the purpose of founding churches in the homeland, but shall remain a missionary agency for the fullest cooperation in foreign missionary effort."

TEAM is controlled by its members, who are its missionaries and those individuals, churches, and other organizations that have contributed $100 or more in a calendar year.

About 96% of TEAM's revenue comes from contributions, about 58% of which are from churches. Member churches include the Evangelical Free Churches of America and churches that are independent, conservative, Baptist, Methodist, and Presbyterian.

TEAM owns two adjacent parcels of real estate in Carol Stream, Illinois. TEAM's administrative headquarters building stands on one parcel. There is no dispute that this parcel is exempt from real estate taxation, as the Department's administrative decision in the 1982 case held that it was exempt and no attempt was made to collect taxes for it for the 1983 calendar year. A three-story, 16-unit, apartment building stands on the other parcel. Whether this parcel was exempt from taxation is very much in dispute.

The apartment building contains efficiency, one-, two-, and three-bedroom apartments. The units are fully furnished and rented exclusively to TEAM missionaries while on furlough in the United States. The rents charged (ranging from $147 per month for an efficiency to $347 per month for a three-bedroom apartment) were below both the market rental value of the apartments and TEAM's costs in providing them.

TEAM has 1,100 missionaries and 55 staff people to assist them. All TEAM missionaries must have biblical training and also must be either ordained or commissioned as ministers by their own churches. Under TEAM's principles and guiding rules, a volunteer wishing to become a missionary:

"[W]ho, after approval by the Board of Directors and attendance at missionary orientation classes, is accepted as an appointee, may proceed to represent the Mission with the purpose of obtaining the support of his or her ministry, including provision for outgoing needs, looking forward to commissioning as a missionary."

Missionaries ordinarily spend three to five years in the field, after which they are required to take furloughs which normally last one year and never last more than 18 months.

The purpose of a furlough "is not only for rest and recuperation, but also for preparation for a subsequent term of service." There are

accordingly many different activities undertaken by a missionary on furlough. The missionary's physical and emotional well-being are assessed, with a thorough medical examination required and counseling available if necessary. The missionary may update the church the missionary serves regarding the status of the ministry in the field. A part of the furlough (six months or less) may be used for additional theological education. Missionaries on furlough continue as representatives of TEAM, and receive furlough allowances from TEAM. As representatives of TEAM, they serve in local churches and Christian organizations, and may share information with college students who are considering similar ministries.

Of the 1,100 missionaries, about 200 are on furlough at a given time. TEAM's policy is to meet with each missionary at its Carol Stream headquarters at least once during a furlough, and preferably both on arrival from the field and immediately before return to the field. The majority of the missionaries are housed throughout the United States in missionary residences provided by local churches. Some stay with family and friends. When they come to TEAM headquarters, TEAM attempts to house them in the apartment building that is the subject of the instant case. Some stay in non-TEAM housing provided by local churches and TEAM does not require any missionary on furlough to stay at the apartment building.

In August 1984, the Department issued its administrative decision with respect to the tax-exempt status of the two parcels for the 1982 calendar year. The Department held that the headquarters building parcel was exempt from taxation but that the apartment building parcel was subject to taxation. On September 20, 1984, TEAM filed a timely complaint to review this administrative decision in the circuit court. See Ill. Rev. Stat. 1983, ch. 110, par. 3—103.

TEAM applied for a real estate tax exemption for the apartment building for calendar year 1983. On June 24, 1985, the Department's hearing officer for the case wrote to TEAM's attorney:

"It was my understanding from our telephone conversation of several weeks ago that you would write me a letter requesting that an office disposition be written using the same facts as appeared in the 1982 record concerning this same property, so that the [1983 case] could be consolidated with that 1982 case on administrative review.

To date, I have not received your letter in this matter. Please send me that letter at your earliest convenience."

On June 27, 1985, TEAM's attorney wrote to the hearing officer in response:

"First let me acknowledge that everything you say in your June 24, 1985 letter is correct and hopefully you will overlook my delay in writing.

Secondly, please let this letter serve as a request on behalf of my client that an office disposition be written for the 1983 case using the same facts as appeared in the 1982 record concerning the same property, and that the captioned 1983 case be consolidated with the 1982 case on administrative review."

In July of 1985, the Department issued its administrative decision denying TEAM's application for a property tax exemption for the apartment building parcel for the 1983 calendar year on the basis of the facts as they appeared in the 1982 case "which is presently on Administrative Review in the Du Page County Circuit Court." The decision did not mention consolidation of the two cases. TEAM did not file a complaint in the circuit court for review within the time provided by the statute. See Ill. Rev. Stat. 1983, ch. 110, par. 3—103.

On September 22, 1986, the circuit court issued a memorandum of decision indicating that the Department's denial of the property tax exemption in the 1982 case would be reversed and ordering counsel for TEAM to prepare a written judgment to that effect. TEAM filed, on October 10, 1986, a motion for leave to file amended and supplemental complaint for administrative review. TEAM sought consolidation, or approval of the consolidation, of the 1982 and 1983 cases and reversal of the Department's administrative decision denying property tax exemption for the apartment building parcel for the 1983 calendar year.

On February 11, 1987, the circuit court entered the two aforementioned orders granting TEAM leave to file its amended and supplemental complaint; consolidating the 1982 and 1983 cases; and reversing the Department's denial of property tax exemption for the apartment building parcel for both of those years. This appeal by the Department followed.

■ The first issue raised by the Department concerns whether the circuit court had jurisdiction over the 1983 case. It is undisputed that the circuit court had jurisdiction over the 1982 case and that the 1982 and 1983 cases presented similar, but not identical, issues. (Compare Ill. Rev. Stat. 1981, ch. 120, par. 500.2 (applicable in the 1982 case) with Ill. Rev. Stat. 1985, ch. 120, par. 500.2 (applicable in the 1983 case).) However, it is well settled that " 'a cause of action for taxes for one year is not the same as or identical with a cause of action for taxes for subsequent years.' " (*Lincoln v. Paschen* (1960), 20 Ill. 2d 229, 230, 170 N.E.2d 111, 112, quoting *People ex rel. Lloyd*

*v. University of Illinois* (1934), 357 Ill. 369, 372, 192 N.E. 243, 245.) Therefore, jurisdiction over the 1982 case was not by itself sufficient to give the circuit court jurisdiction over the 1983 case.

■ The Code of Civil Procedure provides:

"Every action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected thereby." (Ill. Rev. Stat. 1983, ch. 110, par. 3—103.)

As both parties have recognized, compliance with this statute is jurisdictional and any delay in filing a complaint beyond the 35-day period will bar relief. (See, *e.g., Board of Education v. Adelman* (1985), 137 Ill. App. 3d 965, 970, 485 N.E.2d 584, 588; *Owens-Illinois, Inc. v. Bowling* (1981), 99 Ill. App. 3d 1148, 1149, 429 N.E.2d 172, 181-82, *aff'd as modified* (1983), 95 Ill. 2d 397, 447 N.E.2d 1324.) In the 1983 case, TEAM never filed a complaint to review the Department's decision so the circuit court never had jurisdiction over it.

TEAM contends that there was a stipulation to consolidate the 1982 and 1983 cases, evidenced by the letters exchanged by TEAM's counsel and the Department's hearing officer. TEAM also notes that the hearing officer, in the Department's decision which he drafted, incorporated by reference the record and recommendation of the 1982 case. TEAM states its position as follows:

"[W]e are not claiming that the Hearing Officer did anything to affect the 1982 case which was still pending. Rather, the Hearing Officer was consolidating the subject matter of the two cases, since they were identical, leaving it up to the Trial Court's discretion whether to enforce the consolidation or not."

This argument displays a flawed understanding of the nature of the issue on appeal, the nature of a consolidation, and the proceedings in the Department.

First, the issue on appeal concerns the jurisdiction of the circuit court to review the decision of the Department in the 1983 case. The court obviously has no discretion to consider a matter it does not have jurisdiction to hear, so reference to the court's discretion is misleading.

Second, cases can be consolidated only if they are all pending in the same court or agency at the time of consolidation. (See Black's Law Dictionary 280 (5th ed. 1979) (definition of "consolidation of actions").) TEAM's argument speaks of cases which were "pending" in different forums at the time and, thus, misunderstands this requirement.

Third, TEAM misunderstands the proceedings in the Department, so it is necessary to note what the record shows occurred. The final administrative decision in the 1982 case was issued in August of 1984. On June 24, 1985, the hearing officer wrote to TEAM's counsel regarding his understanding that counsel was to write "a letter requesting that an office disposition be written using the same facts as appeared in the 1982 record concerning the same property, so that the [1983 case] could be consolidated with that 1982 case on administrative review." Counsel for TEAM responded with a letter on June 27, 1985, requesting "that an office disposition be written for the 1983 case using the same facts as appeared in the 1982 record concerning the same property, and that the captioned 1983 case be consolidated with the 1982 case on administrative review." The July 1985 decision of the Department incorporated by reference the record and recommendation of the 1982 case but did not mention consolidation.

It is apparent that the hearing officer planned to use the facts adduced in the 1982 case for purposes of deciding the 1983 case, "so that" there could be a consolidation in the circuit court. The hearing officer did not say that he would consolidate the cases in the Department, and the two cases were never consolidated in the Department. Indeed, they could not have been consolidated in the Department because the 1982 case was not then pending in the Department but rather was the subject of a complaint pending in the circuit court for review of the decision. It seems entirely likely that the circuit court, if so moved, would have consolidated the two cases for review, had TEAM filed a timely complaint for review of the 1983 case. However, TEAM did not file such a timely complaint. From TEAM's letter it appears that it misunderstood the hearing officer's letter and believed that the two cases would be consolidated by the Department. However, such a misunderstanding could not give the circuit court jurisdiction it otherwise lacked, and a reading of the final administrative decision, which did not mention consolidation of the cases, should have dispelled any such misunderstanding.

We would further note that the 1983 case was never pending in the circuit court so the court could not consolidate it with the 1982 case. Also, TEAM's amended and supplemental complaint adding the count for the 1983 case did not relate back to the date of the filing of the original complaint because the two cases did not grow out of the same transaction or occurrence. (Ill. Rev. Stat. 1983, ch. 110, par. 2—616(b).) The 1982 and 1983 causes of action were separate; a point highlighted by the fact that the 1983 case could not have been brought in the Department at the time the 1982 case began. More-

over, on review in the circuit court the causes of action would have been even more distinct, since TEAM would have been seeking reversal of two separate final administrative decisions which were filed about 11 months apart. Thus, the order of the circuit court could not serve to give that court jurisdiction over the 1983 case.

The circuit court, therefore, never had jurisdiction over the 1983 case. Its consolidation of the 1982 and 1983 cases and its grant of leave to file the amended and supplemental complaint must be reversed; and its reversal of the Department's final administrative decision in the 1983 case must be vacated.

The second issue raised by the Department concerns the propriety of the trial court's reversal of the Department's administrative decision holding that the apartment building parcel was not tax exempt. The parties both correctly recognize that the facts are undisputed. Therefore, the issue of whether the property is exempt is a question of law the resolution of which " 'depends solely upon an application of the appropriate legal standard to the undisputed facts' " (*Benedictine Sisters of the Sacred Heart v. Department of Revenue* (1987), 155 Ill. App. 3d 325, 327, 508 N.E.2d 470, 472, quoting *Illinois Central Gulf R.R. Co. v. Department of Local Government Affairs* (1983), 95 Ill. 2d 111, 129, 447 N.E.2d 315, 323), and this court must determine whether the trial court properly found that the property was exempt from taxation. *Benedictine Sisters of the Sacred Heart v. Department of Revenue* (1987), 155 Ill. App. 3d 325, 327, 508 N.E.2d 470, 472.

■■■ All property is subject to taxation unless a statute specifically exempts it. (*Benedictine Sisters of the Sacred Heart v. Department of Revenue* (1987), 155 Ill. App. 3d 325, 327, 508 N.E.2d 470, 472.) The constitutional provision authorizing the legislature to exempt certain specified property from taxation states, *inter alia*:

> "The General Assembly by law may exempt from taxation *** property used exclusively *** for *** religious purposes."
> (Ill. Const. 1970, art. IX, §6.)

Section 19 of the Revenue Act of 1939 (the Act) provides that "[a]ll property described in Sections 19.1 through 19.24 to the extent therein limited, is exempt from taxation." (Ill. Rev. Stat. 1981, ch. 120, par. 500.) Section 19.2 of the Act, as it applied in the 1982 calendar year, described as exempt:

> "All property used exclusively for religious purposes, or used exclusively for school and religious purposes, or for orphanages and not leased or otherwise used with a view to profit, including all such property owned by churches or religious institutions or denominations and used in conjunction therewith as

parsonages or other housing facilities provided for ministers (including bishops, district superintendents and similar church officials whose ministerial duties are not limited to a single congregation), their spouses, children and domestic employees, performing the duties of their vocation as ministers at such churches or religious institutions or for such religious denominations, and including the convents and monasteries where persons engaged in religious activities reside." (Ill. Rev. Stat. 1981, ch. 120, par. 500.2.)

Certain well-established principles govern the construction of this statute. Statutes granting tax exemptions are construed strictly in favor of taxation; the party claiming an exemption has the burden of proving clearly and conclusively that the property in question falls within the terms of the statute under which the exemption is claimed; every presumption is against the State's intent to exempt property from taxation; and doubts concerning the applicability of an exemption are resolved in favor of taxation. (*Benedictine Sisters of the Sacred Heart v. Department of Revenue* (1987), 155 Ill. App. 3d 325, 328, 508 N.E.2d 470, 473.) Under section 19.2 of the Act, construed in accordance with the foregoing principles, TEAM's apartment building parcel was exempt from taxation in the 1982 calendar year.

■ In accordance with the requirements of the constitution (Ill. Const. 1970, art. IX, §6), section 19.2 "allows an exemption only for 'property used exclusively for religious purposes.' " (*McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 96, 456 N.E.2d 73, 77; *Benedictine Sisters of the Sacred Heart v. Department of Revenue* (1987), 155 Ill. App. 3d 325, 329, 508 N.E.2d 470, 473; Ill. Rev. Stat. 1981, ch. 120, par. 500.2.) Property satisfies this exclusive-use requirement if it is primarily used for the exempted purpose, even though it may also be used for a secondary or incidental purpose. (*McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 98, 456 N.E.2d 73, 78; *Benedictine Sisters of the Sacred Heart v. Department of Revenue* (1987), 155 Ill. App. 3d 325, 329, 508 N.E.2d 470, 473.) The exemption statute at issue (Ill. Rev. Stat. 1981, ch. 120, par. 500.2) only lists "parsonages or other housing facilities provided for ministers" to illustrate or describe one type of property that, under appropriate circumstances, may qualify for the general religious property exemption. (*McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 96, 456 N.E.2d 73, 77.) The issue then in the case at bar is whether the apartment building parcel was primarily used for religious purposes.

In arguing that the apartment building parcel was subject to taxation, the Department contends:

"[T]his Court should rule that, as a matter of law, the Illinois parsonage exemption applies only to residences of ecclesiastical employees of a local parish or congregation who are required by their duties to reside there."

This contention of the Department is flawed in three respects.

■ First, the Department asks us to limit the exemption to "residences of ecclesiastical *employees* of a local parish or congregation." (Emphasis added.) Neither the constitution (Ill. Const. 1970, art. IX, §6) nor the general religious purposes exemption statute (Ill. Rev. Stat. 1981, ch. 120, par. 500.2) requires that the housing be for an employee for it to be exempt. Moreover, the illustrative and descriptive listing of property used as "parsonages or other housing facilities provided for ministers" does not require that the ministers be employees of the "churches or religious institutions or denominations" that own the property for which the exemption is claimed. (Ill. Rev. Stat. 1981, ch. 120, par. 500.2.) We conclude therefore that the minister for whom housing is provided need not be an employee of the "church or religious institution or denomination" seeking the exemption for the exemption to apply. Ill. Rev. Stat. 1981, ch. 120, par. 500.2.

Second, the Department contends that the minister for whom the housing is provided must be serving a local parish or congregation, labelling this the "local affiliation" requirement at other points in its argument. There is again nothing in the constitution (Ill. Const. 1970, art. IX, §6) or the religious purposes exemption statute (Ill. Rev. Stat. 1981, ch. 120, par. 500.2) which so limits the availability of the exemption. Indeed, the descriptive and illustrative portion of section 19.2 indicates that the legislature intended the exemption to apply to housing provided for "church officials whose ministerial duties are not limited to a single congregation," and that it apply to convents and monasteries which, of course, need not be affiliated with any local parish or congregation. Ill. Rev. Stat. 1981, ch. 120, par. 500.2.

In its brief, the Department cites several cases from other States in support of its claim that the minister for whom the housing is provided must be "an ecclesiastical employee of a local parish or congregation" for the exemption to apply. (*East Coast Conference of the Evangelical Covenant Church of America, Inc. v. Supervisor of Assessments* (1978), 40 Md. App. 213, 388 A.2d 177; *Harmon v. North Pacific Union Conference of Seventh Day Adventists* (Alaska 1969), 462 P.2d 432; *Missionaries of Our Lady of La Salette v. Michalski* (1962), 15 Wis. 2d 593, 113 N.W.2d 427; *International Missions, Inc. v. Borough of Lincoln Park* (1965), 87 N.J. Super. 170, 208 A.2d 431.) The statutes involved in those cases differ significantly from section

19.2, so those cases are of little value in interpreting section 19.2.

In its reply brief, the Department argues:

"The 'local' affiliation requirement is a manifestation of the public policy and legislative purpose behind the grant of tax-exempt status of [*sic*] certain parcels. That policy 'is the benefit upon the public by them, and a consequent *relief,* to some extent, *of the State to care for and advance the interests of its citizens.' Congregation Sunday School v. Board of Review,* 290 Ill. 108, 125 N.E. 7, 10 (1919) (emphasis added). \*\*\* [T]o be exempt the parcel must serve the purpose of benefiting the citizens of Illinois and relieving to some extent, the State of Illinois from the burden of caring and providing for its citizens. *Congregational Sunday School, supra.* This purpose and public policy is only effectuated where the ecclesiastical resident or residents of the parcel serve a local church or congregation of Illinois citizens.

\* \* \*

\*\*\* Such property [the apartment building housing furloughed missionaries] is not used to benefit Illinois citizens and relieve the State of the burden of caring for its citizens."

There are three problems with this argument.

Once again, the Department has failed to take into consideration the language of the statute including convents and monasteries. Clearly, if they are included, the legislature did not intend that the exemption require service by the ministers at local churches for their housing to be tax exempt.

Additionally, the manner in which the *Congregational Sunday School* case is cited in the Department's reply brief is very misleading. The sentence partially quoted comes at the end of a paragraph in which the prior sentences discuss what a charity and what a charitable institution are. (*Congregational Sunday School & Publishing Society v. Board of Review* (1919), 290 Ill. 108, 113, 125 N.E. 7, 9-10.) The complete sentence reads:

"The fundamental ground upon which all exemptions in favor of charitable institutions are based is the benefit conferred upon the public by them, and a consequent relief, to some extent, of the burden upon the State to care for and advance the interests of its citizens." (*Congregational Sunday School & Publishing Society v. Board of Review* (1919), 290 Ill. 108, 113, 125 N.E. 7, 10.)

In its context the passage quoted by the Department was clearly a statement of the rationale for exemptions for charitable purposes, and

not for exemptions for religious purposes.

Finally, it is apparent that the quoted rationale cannot be used, as the Department suggests, as a test for determining the applicability of the religious purposes exemption. If it requires, as the Department interprets it, a showing of some benefit to the citizens of this State, it is probably not even an appropriate test for determining the applicability of the charitable purposes exemption, since such an interpretation would make the exemption unavailable for charities seeking to aid people outside of this State (*e.g.*, Texas tornado victims or African famine victims). (*Cf. Hitchcock v. Board of Home Missions of the Presbyterian Church* (1913), 259 Ill. 288, 102 N.E. 741 (bequest for foreign missions a valid gift to charity).) Moreover, because the State cannot constitutionally do so, it obviously has no burden to provide for its citizens' religious care and interests. (U.S. Const., amend. I; Ill. Const. 1970, art. I, §3.) That nonexistent burden's relief, therefore, cannot be a consideration in determining the applicability of the religious purposes exemption.

Third, the Department contends that the exemption applies to housing of ministers "who are required by their duties to live there." This misstates the test set forth in *McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 456 N.E.2d 73.

This contention of the Department goes to the core question in this case of whether the apartment building parcel was primarily used for religious purposes. In *McKenzie v. Johnson* our supreme court said:

> "[A] parsonage qualifies for an exemption [under Ill. Rev. Stat. 1981, ch. 120, par. 500.2] if it reasonably and substantially facilitates the aims of religious worship or religious instruction because the pastor's religious duties require him to live in close proximity to the church or because the parsonage has unique facilities for religious worship and instruction or is primarily used for such purposes." (Emphasis added.) (*McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 99, 456 N.E.2d 73, 79.)

It is noteworthy that under *McKenzie v. Johnson* it is not necessary that a minister's duties require him or her to live in the parsonage; rather, the exemption is applicable if "the pastor's religious duties require him to live *in close proximity to the church.*" (Emphasis added.) (*McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 99, 456 N.E.2d 73, 79. Contra *Lutheran Child & Family Services v. Department of Revenue* (1987), 160 Ill. App. 3d 420, 425, 513 N.E.2d 587, 591.) Because the religious aims of TEAM as a missionary agency differ from the religious aims of a local church, the *McKenzie v. Johnson* test for the ap-

plicability of the exemption to a parsonage provided for the pastor of a local church does not directly apply in the case at bar. However, it does guide our analysis of the issue.

TEAM's fundamental religious aim is to carry on its missionary ministry in other countries. Similarly, the ministers who are TEAM's missionaries have fundamental religious duties concerning that missionary ministry. The missionaries' duties are cyclical, alternating between those they have during their periods of service in the field and those they have during their periods of furlough. During their furloughs they prepare themselves physically, psychologically, educationally, and financially for service in the field. The furloughs are necessary to the missionary ministry and are therefore mandatory. During the furloughs, TEAM requires all of the missionaries to come to its Carol Stream headquarters for debriefing and other furlough-related activities at least once, and preferably twice. The apartment building, which is next door to the headquarters building, reasonably and substantially facilitates TEAM's aim of religious missionary activity because the missionaries' religious duties to prepare to return to the field require that, for part of their furloughs, they live in close proximity to the headquarters building. The apartment building, which many of the missionaries used during their time in the area of the headquarters building, was, therefore, used primarily for religious purposes and so was tax exempt in 1982.

We affirm that portion of the circuit court of Du Page County's judgment reversing the administrative decision in the 1982 case, reverse the order consolidating the 1982 and 1983 cases and granting leave to file an amended and supplemental complaint, and vacate that portion of the judgment reversing the administrative decision in the 1983 case.

Affirmed in part; reversed in part; and vacated in part.

INGLIS and UNVERZAGT, JJ., concur.